1

2

3

4

5          **UNITED STATES DISTRICT COURT**

6          **EASTERN DISTRICT OF CALIFORNIA**

7

8    MARGARET MARTINEZ,                    CASE NO. 1:14-CV-1548-SMS

9              Plaintiff,

10                                         ORDER AFFIRMING AGENCY'S
     v.                                    DENIAL OF BENEFITS AND ORDERING
11                                         JUDGMENT FOR COMMISSIONER
     CAROLYN W. COLVIN, Acting
12   Commissioner of Social Security,
                                           (Doc. 21)
13             Defendant.

14

15         Plaintiff Margaret Martinez, by her attorney, seeks judicial review of a final decision of the

16   Commissioner of Social Security ("Commissioner") denying her application for disability

17   insurance and supplemental insurance benefits pursuant to Titles II and XVI of the Social Security

18   Act (42 U.S.C. § 301 *et seq.*) (the "Act"). The matter is currently before the Court on the parties'

19   cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder,

20   United States Magistrate Judge.  Following a review of the complete record and applicable law,

21   this Court finds the decision of the Administrative Law Judge ("ALJ") to be supported by

22   substantial evidence in the record as a whole and based on proper legal standards.

23      **I.**     **Background**

24         A. Procedural History

25         In February 2011, Plaintiff filed applications for disability insurance benefits and

26   supplemental security income, alleging an onset of disability date of January 1, 2008. The

27   Commissioner initially denied the claims on August 15, 2011, and upon reconsideration again

28   denied the claims on February 15, 2012.  On February 22, 2012, Plaintiff filed a timely request for

a hearing.

On December 19, 2012, and represented by counsel, Plaintiff appeared and testified at a hearing presided over by John Cusker, Administrative Law Judge ("the ALJ").  See 20 C.F.R. 404.929 et seq.  An impartial vocational expert, Thomas C. Dachelet ("the VE"), also appeared and testified.

On March 11, 2013, the ALJ denied Plaintiff's application.  The Appeals Council denied review on July 29, 2014.  The ALJ's decision thus became the Commissioner's final decision.  See 42 U.S.C. § 405(h).  On October 2, 2014, Plaintiff filed a complaint seeking this Court's review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

B.  Plaintiff's Testimony

At the administrative hearing, Plaintiff was fifty-three years old. She was unable to drive, and her daughter-in-law had brought her to the hearing. Plaintiff was a high school graduate. She had last worked for several years as an in-home care provider to a relative. She had also worked as a field worker, but did not recall when. She remembered working "a lot of places" but did not remember what type of work or when it was performed.

Plaintiff testified that she had last worked in 2008 and could no longer work due to side effects from her several medications. She testified that she had neck, back, and arm pain, and depression. In 2009, Plaintiff had lost her house and was in the process of applying for social security and disability insurance benefits. She left her children and went to a park. She drank what she thought was soda, went home and took "a bunch of my medications." Her daughter called an ambulance. She stated that she did not trust anyone nor did she go out after that.

At the time of the hearing, Plaintiff was taking four types of narcotics for back pain. She testified that they did not relieve her pain symptoms all the time and that she had side effects such as blurred speech, poor memory, and sleepiness. The day of the hearing, she took four morphine doses in order to be able to sit through the hearing. The medication reduced her pain enough to allow her to sit there. Plaintiff testified that her back had "on and off constant" pain, and was aggravated by being bumped. Lying down was the most comfortable position for her back, and she lied down for about four hours, on and off, depending on the day.

Plaintiff also testified that she had neck pain. Sometimes she would move the wrong way, twitch a nerve, and feel that she wanted to cut off her neck. Plaintiff tried to limit her head movement. Plaintiff had suffered more than one fall. Once, she hit her head and needed stiches. Plaintiff had headaches that came and went. Medication would alleviate a headache for half an hour.

Plaintiff testified that she had trouble focusing on things. She did not know what PTSD was. Regarding depression, she testified that she constantly wanted to be left alone and sometimes did not care about life. She was receiving mental health treatment at Reedley Turning Point. She would go there and talk about how she felt and what was going on with her. Plaintiff had flashbacks to being raped.

Plaintiff testified that she was married but she did not know if her spouse was employed. She testified that he visited her home in Reedley about once a month. The ALJ pointed out that a hospital record noted that her husband had returned from a business trip and found Plaintiff at home barely responsive. The ALJ also pointed out that Plaintiff had testified in a prior administrative hearing that she did not know where her husband lived. Plaintiff testified that he lived nearby in Reedley, but she did not know specifically where.

Plaintiff lived with her two younger children, aged seventeen and fourteen. Her twenty-one year-old son also stayed with her sometimes. Her oldest son and his wife would check on her. The younger children went to school, leaving her home alone. Plaintiff was able to dress and bathe herself, but she would not bathe herself unless someone else was at home. She did not prepare meals. When someone else was around, she could go shopping or do some housework such as wash dishes. She needed someone else to be there to make sure she didn't fall or hurt herself. She did not have any hobbies. She spent her time resting or talking with her children. She napped four to five times a day, each nap ranging from about twenty minutes to three hours. Plaintiff had difficulty sleeping because of pain.

C. Relevant Medical Record

*Physical Impairments*

In May 2007, Plaintiff's MRIs indicated chronic neck pain and chronic low back pain. AR

566-567. The MRIs revealed slight scoliosis, degenerative disc disease at facet arthropathy, disc space narrowing, and disc bulging. In July 2008, Plaintiff's MRIs indicated cervical osteophytosis and spinal stenosis and revealed similar findings. AR 441-442. In June 2011, Plaintiff's MRIs indicated low back pain and similar findings. AR 449. In June 2011, the radiologist suspected mild lower lumbar degenerative disc disease and facet athropathy.

During 2008-2011, the Plaintiff attended regular appointments at Sierra Kings Family Health Center, primarily for monthly refills of her medication. Plaintiff complained of hypertension, hyperlipidemia, asthma, and lower back pain. In November 2008, these conditions were stable. AR 425.

In June 2011, consultative examiner Roger Wagner, M.D., performed a comprehensive internal medicine evaluation. AR 450-455. He noted Plaintiff's complaints of low back pain and her assertion that she could only walk for two blocks and sit for two hours. He noted that she was sitting comfortably on the tailgate of a vehicle for about half an hour prior to the exam in the early morning. He noted her vague complaints of weakness in her legs and numbness in hands. He noted that she does light cooking and cleaning, shops, performs her own activities of daily living, and walks for exercise.  He noted her fifteen different medications. Dr. Wagner also noted that Plaintiff did not have problems maneuvering during the examination. She was easily able to get up and walk to the examination room without assistance, sit comfortably, get on and off the examination table, and bend over to take her shoes and socks off and on. Dr. Wagner noted that she had a normal gait and did not need an assistive device. Dr. Wagner diagnosed Plaintiff with "some low back pain," likely due to degenerative disc disease, arthritic pain, and muscular strain, with a reasonable walking tolerance of two blocks and the ability to sit for up to two hours. He also diagnosed her with neck pain due to degenerative joint disease. Plaintiff had a full range of motion in the shoulders and fairly good range of motion of the neck. Dr. Wagner noted that Plaintiff's asthma appeared stable. Based on his examination findings, Dr. Wagner opined that Plaintiff could stand and walk up to six hours, sit without limitations, lift twenty pounds occasionally and ten pounds frequently,  could not repeatedly lift above shoulder level, and should not work around chemicals, dust, fumes, or gasses.

In July 2011, M. Nawar, M.D., provided a case analysis which discussed Plaintiff's physical complaints and depression. AR 480-482. He also completed a physical residual functional capacity assessment. AR 475-479. Dr. Nawar diagnosed Plaintiff with degenerative disc disease and asthma. Dr. Nawar opined that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk about six hours and sit about six hours in an eight-hour workday. He opined that Plaintiff had unlimited push/pull capacity. He opined that Plaintiff could frequently perform all postural requirements except only occasionally climb ladders, ropes, or scaffolds. He assessed no manipulative or visual limitations. He found that Plaintiff should avoid concentrated exposure to fumes, odors, etc. due to asthma. In February 2012, Karl Boatman, M.D., reviewed the medical evidence and affirmed Dr. Nawar's assessment. AR 527.

In September 2011, Plaintiff's primary care physician Dr. Antonio Villalvazo, M.D., completed a questionnaire, in which he noted that her medical problems would preclude her from performing any full-time work at any exertional level. AR 509-510. He noted that she had lower and upper back pain based on instability walking and difficulty moving. Dr. Villalvazo estimated that Plaintiff could sit for one or two hours and stand for thirty minutes in an eight-hour workday.

In about October 2011 to November 2012, Plaintiff began receiving primary care at Reedley Wellness Center with Jacob Peters, M.D. Dr. Peters also noted her injury in 1988. Plaintiff presented with neck pain, arthritis, hypothyroidism, hypertension, hyperlipidemia, gastritis, anxiety, and pulmonary disease related to smoking. He recommended daily vigorous exercise. AR 542-548. Her progress notes usually only indicated that she was refilling her medication. See AR 549-562.

*Mental Impairments*

Plaintiff complained of depression to her primary care physician as early as October 2008. AR 426. Plaintiff's medical notes began to indicate depression regularly around September 2010. AR 399. She first requested to see a psychiatrist in March 2011. AR 392. The notes do not mention a prescription for any mental health medications prior to July 2011.

In June 2011, social worker Veronica De Alba, L.C.S.W, completed a mental health

assessment. AR 459-465. She noted moderate to severe problems in most domains, including depression, traumatic stress, relationships, work, anxiety, thought process, and cognitive process. Ms. De Alba noted no problems with behavior at home and in the socio-legal domain. She also noted that Plaintiff's primary care physician, Dr. Villalvazo prescribed Paxil a year prior.

In July 2011, Plaintiff was evaluated by psychiatrist Norberto Tuason, M.D., at Turning Point of Central California. AR 457-458. He noted that Plaintiff said that her son recommended that she seek psychiatric help because of worsening depression. Dr. Tuason noted that Plaintiff was separated from her siblings since age seven, which triggered her depression. Plaintiff lived with her grandmother and her siblings went to foster homes. Plaintiff was sexually abused at that age. She felt paranoid and heard voices but could not remember the onset. Plaintiff started to use alcohol at age twenty-one, but stopped several years ago. Plaintiff suffered a fall twenty-two years prior and had been unable to work since then due to recurrent neck and lower back pain. Dr. Tuason diagnosed Plaintiff with major depression recurrent severe with psychotic features, and alcohol abuse by history. He recommended Zoloft, Risperdal, and Benadryl.

In July 2011, clinical psychologist Steven Swanson, PhD, performed a psychological assessment on behalf of DSS. AR 467-473. Plaintiff told Dr. Swanson that she was raised by her father and stepmother. She was a slow learner, but graduated from high school. She began doing farm labor with her father at a young age. She had been married twice and had four children. She historically consumed alcohol heavily, but did not drink heavily in recent years. She was a long-time smoker. She injured her back in 1988. Dr. Swanson noted that Plaintiff was adequately oriented, friendly, and cooperative with normal eye-contact. Nothing atypical was observed in her gait, posture, or motor movement. Her mood was mostly euthymic. Her thought content was normal. There was no evidence of delusion, perception disorder, or psychosis. Short-term, recent, and remote memories were normal. She had adequate abstraction ability, concentration, and judgment. Dr. Swanson performed an adult intelligence test. He diagnosed Plaintiff with alcohol abuse in partial remission and borderline intellectual functioning. Dr. Swanson opined that Plaintiff was able to maintain concentration and related appropriately to others in a job setting. She could handle funds, understand and carry out simple instructions, and respond to work situations

1   such as attendance and safety. He noted that changes in routine would not be excessively

2   problematic for her and there were no substantial restrictions in daily functioning or maintaining

3   social relationships.

4        In August 2011, Anna Franco, PsyD., completed a mental residual functional capacity

5   assessment. AR 484-486. She found that Plaintiff was moderately limited in the ability to

6   understand, remember, and carry out detailed instructions. Otherwise, she found that Plaintiff was

7   not significantly limited in any areas of understanding and memory, sustained concentration and

8   persistence, social interaction, or adaptation. Dr. Franco noted that Plaintiff had mild limitation in

9   activities of daily living, and moderate difficulties in maintaining concentration, persistence, and

10  pace. AR 498. She opined that Plaintiff was capable of simple, repetitive work, could sustain

11  concentration, persistence, and pace, and could engage in appropriate social interactions and adapt

12  accordingly.  In February 2012, Cynthia Kampschaefer, PsyD., reviewed the medical evidence and

13  affirmed Dr. Franco's assessment. AR 526.

14       Plaintiff began attending monthly appointments with Dr. Tuason at Turning Point. In

15  August 2011, Dr. Tuason noted that Plaintiff's sleep and appetite were within normal limits, her

16  behavior and sensorium were within normal limits, but her appearance was disheveled, her speech

17  was slow, and her affect was flat, and there was no assessment of suicide risk. AR 515. In October

18  2011, Dr. Tuason noted that Plaintiff felt better with her medications, her sleep and appetite were

19  within normal limits, her behavior, speech, and sensorium were within normal limits, but her

20  appearance was disheveled and her affect was flat, and there was no assessment of suicide risk.

21  AR 514. In September 2011, Dr. Tuason noted that Plaintiff said she was doing well and had

22  partially improved, her sleep, appetite, and mood were within normal limits, her appearance,

23  behavior, speech, sensorium, and affect were within normal limits, and there was no assessment of

24  suicide risk. AR 539.  In November 2011, Dr. Tuason noted that Plaintiff had partially improved,

25  her sleep and appetite were within normal limits, her appearance, behavior, speech, sensorium, and

26  affect were within normal limits, and there was no assessment of suicide risk. AR 513. In January

27  2012, Dr. Tuason noted chronic pain due to cervical disc problem, which was more likely keeping

28  her depressed with insomnia. AR 538.

In September 2011, Dr. Tuason provided a psychiatric medical source statement. AR 504-508. He found that she had extreme (almost constant impact on work or total limitation) limitations in almost all of her social abilities, including her ability to interact with supervisors and coworkers, and her ability to understand and carry out simple one-or-two step job instructions. He noted that she had depressive syndrome characterized by every possible characteristic, including sleep and appetite disturbance, difficulty concentrating, and thoughts of suicide. He also noted anxiety with motor tension.

In May 2012, Robert Ensom, M.D. had become Plaintiff's treating psychiatrist and noted that Plaintiff's sleep and appetite were impaired due to pain, but her behavior, speech, sensorium, and affect were within normal limits. AR 537.

In November 2012, Plaintiff's primary care physician Dr. Peters completed a psychiatric medical source statement. AR 598. He noted that she had a moderate ability to perform most work functions, except that she had an extreme limitation in her ability to withstand stress and pressure associated with an eight-hour workday. Dr. Peters noted that she had severe neck and back pain since 1988, which was disabling. He opined that she was unable to work.

In December 2012, Dr. Ensom completed a mental disorder questionnaire, indicating that Plaintiff's mental health affected her ability to manage basic daily activities and impaired her ability to socialize in a culturally acceptable manner. AR 600-602. He noted that she had significant impairments in memory, concentration, and judgment, but no impairment in intelligence. Dr. Ensom noted that Plaintiff was unable to care for herself without family assistance. Dr. Ensom noted that his first examination of Plaintiff was July 2011, and the last was May 2012, with appointments every three months. His next appointment was scheduled for later in December 2012.

D.  Vocational Expert Testimony

At the administrative hearing, the VE classified Plaintiff's past work as home health aide (DOT # 354.377-014, medium (performed at heavy), SVP 3), field work with fruit (DOT # 403.687-010, medium, SVP 2), production sorter (DOT # 529.687-186, light, SVP 2), and production packer (DOT # 920.587-018, medium, SVP 2). The ALJ asked the VE to assume a

hypothetical person of Plaintiff's same age, education, and work experience who could stand and walk up to six hours, could sit without limitation with normal breaks, did not need an assistive device, could lift and carry up to twenty pounds occasionally and ten pounds frequently, must avoid lifting above the shoulder, and should not work around chemicals, dusts, fumes, or gases. The VE opined that such person could not perform any of Plaintiff's past jobs, but could perform at the light and unskilled level, without overhead lifting.

The ALJ then directed the VE to assume a second hypothetical person with the same limitations as the first hypothetical person and was capable of simple, repetitive work; could sustain concentration, persistence and pace; could engage in appropriate social interactions and adapt accordingly.  The VE opined that this hypothetical person could perform work in several jobs and gave some representative titles. The VE testified that the second hypothetical person could perform work as a packing line worker (DOT # 753.687-038), garment sorter (DOT # 222.687-014, and ampoule filler (DOT # 559.685-018. The VE testified that these jobs existed in significant numbers in the California and national economy.

For the third hypothetical, the ALJ directed the VE to assume a person who was able to lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk with normal breaks for about six hours and sit with normal breaks for about six hours in an eight-hour workday; push and pull without limitation; occasionally climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. This hypothetical person had no manipulative, visual, or communicative limitations. The VE opined that this hypothetical individual could perform the jobs identified in response to the second hypothetical.

For the fourth hypothetical, the ALJ directed the VE to assume the same physical limitations as the third hypothetical person, but also is expected to understand, carry out, and remember simple instructions; is able to respond appropriately to usual work situations including matters such as attendance and safety; and could handle changes in routine. The VE opined that this hypothetical individual could also perform the jobs identified in response to the second hypothetical.

E.  Disability Determination

After considering the evidence, the ALJ found that Plaintiff met the insured status requirements through December 31, 2011.  The ALJ found that Plaintiff had not engaged in substantial gainful activity since August 6, 2009, the day following the prior administrative decision. The ALJ found that Plaintiff had the following severe, medically determinable impairments: degenerative disc disease of the cervical spine and lumbar spine; opioid abuse and/or dependence, and borderline intellectual functioning. The ALJ found that Plaintiff's hypertension, headaches, and vision problems were non-severe. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. He found that Plaintiff had the residual functional capacity ("RFC") to lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours and sit for six hours in an eight-hour workday; push and pull without limitation; occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; and should avoid fumes, odors, dusts, gases, poor ventilation, etc. The ALJ found that Plaintiff could understand, carry out, and remember simple instructions, and had the ability to respond appropriately to usual work situations including attendance and safety. The ALJ found that changes in routine would not be excessively problematic for her. The ALJ found that Plaintiff was unable to perform any of her past relevant work. However, the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy. Hence, he determined that Plaintiff was not disabled.

**II.  Legal Standard**

A.  The Five-Step Sequential Analysis

An individual is considered disabled for purposes of disability benefits if she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a) (3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment(s) must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically

accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  In the five-step sequential review process, the burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five. *See Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Id.* at 1098–99; 20 C.F.R. §§ 404.1520, 416.920.

In the first step of the analysis, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, in the second step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, in the third step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments, 20 C.F.R. 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).  If not, in the fourth step, the ALJ must determine whether the claimant has sufficient RFC, despite the impairment or various limitations to perform his past work.  *Id*. §§ 404.1520(f), 416.920(f).  If not, in step five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id*. §§ 404.1520(g), 416.920(g).

B.  Standard of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks

omitted).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  If an ALJ applied the proper legal standards and the ALJ's findings are supported by substantial evidence, this Court must uphold the ALJ's determination that the claimant is not disabled.  *See, e.g., Ukolov v. Barnhart*, 420 F.3d 1002, 104 (9th Cir. 2005); *see also* 42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Where the evidence as a whole can support either outcome, the Court may not substitute its judgment for the ALJ's, rather, the ALJ's conclusion must be upheld. *Id*.

## III.  Discussion

In this appeal, Plaintiff argues that the ALJ erred in failing to consider all medically determinable mental impairments at step-two, discrediting her treating physicians' opinions, discrediting Plaintiff's credibility, and discrediting laywitness testimony.

### A.  Step-Two Severe Impairments

Plaintiff argues in her motion and reply that the ALJ erred in failing to find Plaintiff's major depression disorder and PTSD as severe impairments. Plaintiff argues that the failure to consider the severity of all of Plaintiff's medically determinable mental impairments at step two affected his findings at the subsequent steps of the sequential evaluation.

*Applicable Law*

Under the regulations, the procedure at step two is as follows:

At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. ... If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.

20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

Thus, at step two, a claimant can only be prejudiced by a finding that he has no severe

1    impairments at all; otherwise, he advances to the next steps. The later steps do not make use of the

2    step-two finding. Instead, the ALJ must consider all of Plaintiff's limitations, again and in even

3    greater depth. *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011) (at

4    step three, ALJ must consider "the combined effect of [Plaintiff's] limitations, both severe and

5    non-severe," to determine whether they meet or equal a listing); 20 CFR 404.1545(e) ("we will

6    consider the limiting effects of all your impairment(s), even those that are not severe, in

7    determining your residual functional capacity" for use at steps four and five). In other words, the

8    impairments identified at step two are not intended to be a comprehensive survey. Step two is

9    simply "a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80

10   F.3d 1273, 1290 (9th Cir.1996).

11   *Analysis*

12           Here, the ALJ found that Plaintiff's severe impairments were degenerative disc disease,

13   opioid abuse, and borderline intellectual functioning. Thus Plaintiff advanced to the next steps in

14   the sequential analysis. The ALJ did not find that depression and PTSD were among Plaintiff's

15   severe impairments such that it significantly limited her ability to do basic work activities.

16   However, Plaintiff is incorrect to assert that the ALJ did not consider her depression and PTSD.

17   The ALJ discussed Plaintiff's depression at various points in his written decision, including her

18   RFC which was used at steps four and five. In arriving at Plaintiff's RFC, the ALJ discussed all of

19   Plaintiff's mental health history including her diagnoses of major depressive disorder and PTSD.

20   The ALJ discussed each of Plaintiff's mental healthcare providers and their notes and opinions,

21   including their discussions of her depression and the effects that her mental health impairments

22   had on her ability to function in a work setting. The ALJ affirmatively considered Plaintiff's

23   diagnoses of depression and PTSD. He did not find those impairments to be severe at step two,

24   such that they had significantly limited her ability to do basic work activities. However, the ALJ

25   considered Plaintiff's depression and other mental impairments in his RFC and found that she was

26   able to understand and carry out simple instructions and was able to respond appropriately to usual

27   work settings. Hence, the ALJ did not err at step-two in failing to consider Plaintiff's depression

28   and PTSD as severe.

B. <u>Weighing Medical Evidence</u>

Plaintiff argues that the ALJ failed to give controlling deference to her treating psychiatrists Drs. Tuason and Ensom and her primary care physicians Drs. Villalvazo and Peters, and failed to give specific and legitimate reasons to reject their opinions. These medical sources found that Plaintiff's capacity was much more limited than that found by the ALJ.

*1. Applicable Law*

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008); S.S.R. 96-5p, 1996 SSR LEXIS 2.

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician. *Id*. The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007). A treating physician is employed to cure and has a greater opportunity to know and observe the patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing

1  reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 831. The controverted

2  opinion of a treating or examining physician can only be rejected for specific and legitimate

3  reasons supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043

4  (9th Cir. 1995). "Although the contrary opinion of a non-examining medical expert does not alone

5  constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, it

6  may constitute substantial evidence when it is consistent with other independent evidence in the

7  record." *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001), *citing Magallanes*, 881 F.2d

8  at 752. The ALJ must set forth a detailed and thorough factual summary, address conflicting

9  clinical evidence, interpret the evidence and make a finding. *Magallanes*, 881 F.2d at 751-55. The

10  ALJ need not give weight to a conclusory opinion supported by minimal clinical findings. *Meanel*

11  *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751. The ALJ must tie the

12  objective factors or the record as a whole to the opinions and findings that he or she rejects.

13  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)

14  ### 2.  *Plaintiff's Treating Psychiatrists*

15  As discussed above, Dr. Tuason opined that Plaintiff had extreme limitations in all areas of

16  mental functioning. The ALJ gave Dr. Tuason's opinion "no weight" because it was inconsistent

17  with other medical evidence of record, including Dr. Tuason's own treatment notes and Plaintiff's

18  presentation to Dr. Swanson. The ALJ specifically and correctly pointed to Dr. Tuason's notes

19  which, prior to offering his opinion, consistently indicated normal limits for sleep and appetite,

20  which are in contrast to his opinion that her depression was characterized by sleep and appetite

21  disturbance. Dr. Tuason also opined that her depressive syndrome was characterized by thoughts

22  of suicide, even though he consistently indicated that there was no assessment of suicide risk. Dr.

23  Tuason opined that Plaintiff had extreme limitations in her ability to interact with supervisors and

24  carry out simple instructions. However, the examination with Dr. Swanson demonstrated that she

25  had no problem interacting with Dr. Swanson, who noted that she was adequately oriented,

26  friendly, and cooperative, and was able to carry out instructions such as removing her shoes and

27  performing functional motor tests.

28  Dr. Ensom opined that Plaintiff was unable to perform activities of daily living without

assistance, that her social functioning was deficient, and that she was unable to adapt to common work stressors. Dr. Ensom also noted that she was significantly impaired in memory, concentration, and judgment, but had no impairment in intelligence. Dr. Ensom appears to have treated Plaintiff once prior to completing his opinion. The ALJ gave Dr. Ensom's opinion no weight because it was inconsistent with other medical findings, including findings for Drs. Swanson and Tuason, and inconsistent with the record, particularly with regard to daily activities. The ALJ correctly found that Dr. Ensom's opinion was inconsistent with the record. Dr. Swanson found that Plaintiff had borderline intellectual functioning, and was capable of normal social interaction. Dr. Swanson performed tests which indicated that Plaintiff's thought content, abstraction ability, concentration, judgment and memory were normal. The record also indicated that Plaintiff performed personal activities of daily living without assistance.

In addition, Drs. Tuason and Ensom's opinions were contradicted by Dr. Swanson's and Dr. Franco's opinions. The ALJ gave Dr. Swanson's opinion great weight because his findings were consistent with his clinical findings and test results. The ALJ also gave Dr. Franco's opinion great weight because it was substantially supported by and consistent with the evidence in the record. Drs. Swanson and Franco opined that Plaintiff was able to understand, remember, and carry out simple instructions, and could engage appropriate in work settings. These findings are supported by Plaintiff's ability to interact with her doctors and examiners, her family and friends, and perform simple tasks at home and in the examination setting. Thus, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record for discrediting Drs. Tuason and Ensom's opinions.

### 3. *Plaintiff's Treating Primary Care Physicians*

Plaintiff's primary care physician Dr. Villalvazo found that Plaintiff could not perform full-time work at any exertional level. The ALJ gave no weight to this opinion because it was inconsistent with the medical evidence of record and Dr. Wagner's examination. The ALJ specifically points to the discrepancy between Dr. Villalvezo's opinion based on Plaintiff's instability walking and difficulty moving and Dr. Wagner's observation that Plaintiff had no difficulty maneuvering during the examination. She was able to get up and down from a chair,

1    walk around the room without assistance, get on and off the examination table, bend over to

2    remove her shoes, and sat comfortably. In addition, Dr. Swanson also noted that nothing atypical

3    was observed in Plaintiff's gait, posture, or motor movement.

4            Dr. Peters also opined in a psychiatric medical source statement, that Plaintiff was unable

5    to work. He opined that Plaintiff had severe neck and back pain, and that she had extreme

6    limitations in her ability to withstand stress and pressure in a work setting. The ALJ gave Dr.

7    Peter's opinion no weight because it was not supported by the medical record or the other medical

8    source opinions by better qualified mental health professionals. Dr. Peters was Plaintiff's primary

9    care physician, not a psychiatrist or mental health source. Dr. Peters' notes mostly indicate that

10   Plaintiff was refilling her medication. Regarding mental health, Dr. Peters only noted anxiety.

11   Thus Dr. Peters' opinion regarding Plaintiff's mental health can properly be discredited. Further,

12   Dr. Peters recommended daily vigorous exercise, which is inconsistent with a finding of disability

13   due to pain.

14           Further, Drs. Villalvazo and Peters's opinions were contradicted by Drs. Wagner and

15   Nawar. Dr. Nawar opined that Plaintiff could perform work according to that adopted by the ALJ.

16   He opined that she could stand and walk for six hours and sit for six hours in a workday. She

17   could do some lifting, posturing, and manipulating. She was to avoid concentrated exposure to

18   irritants due to asthma. Dr. Wagner's opinion was substantially similar, except he further limited

19   Plaintiff's overhead reaching. The ALJ gave Dr. Nawar's opinion the most weight because it was

20   supported by and consistent with the other medical evidence, including Dr. Wagner's examination

21   findings and treatment records. This finding is supported by the record. MRIs showed mild

22   degenerative disc disease and other mild findings. The examination revealed full ranges of motion

23   of the cervical and lumbar spine, no assistive device was needed to ambulate, and she had a

24   normal gait. She also had a full range of shoulder motion and good range of neck motion. Plaintiff

25   reported to Dr. Wagner that she could do light cooking, cleaning, shopping, and walking.  She was

26   able to sit comfortably in the examination and on the back of a vehicle for some time before the

27   examination. Plaintiff reported no change or worsening of her condition.

28           The ALJ properly found that Plaintiff's primary care physicians' opinions were not

                                                    17

supported by the record and that Dr. Nawar's opinion was. Thus, the ALJ gave specific and

legitimate reasons supported by substantial evidence in the record to discredit Drs. Villalvazo and

Peters' opinions.

### 4.   *The Combined Impact of Plaintiff's Mental and Physical Impairments*

Plaintiff argues that the ALJ erred in failing to consider the combined impact of Plaintiff's

mental and physical impairments.  However, the ALJ's opinion demonstrates that the ALJ did

consider the combined effect of Plaintiff's physical and mental impairments at various steps in his

decision. The ALJ discussed several of Plaintiff's medical sources that mentioned the relationship

between Plaintiff's physical and mental impairments, specifically, her pain and depression.

### 5.   *Duty to Develop the Record*

Plaintiff mentions in passing that the ALJ should have further developed the record.

Plaintiff argues that the ALJ was required to contact Dr. Villalvazo to ask him the basis of his

opinion prior to rejecting his opinion. Plaintiff also argues that Dr. Peter's opinion assessing the

combined effects of Plaintiff's mental and physical impairments required the ALJ to further

develop the record by obtaining an updated medical opinion because it was not reviewed by

another medical expert.

An "ALJ's duty to develop the record farther is triggered only when there is ambiguous

evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes

v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001); *and see Tommasetti v. Astrue*, 533 F.3d 1035,

1041 (9th Cir. 2008)("[T]he ALJ is the final arbiter with respect to resolving conflicts and

ambiguities in the evidence."). Here, the ALJ's duty to develop the record was not triggered

because there were no ambiguities and the record was not inadequate to allow for proper

evaluation of the evidence. Plaintiff's record included all of her physical and mental health

treatment notes during the relevant time period and several straightforward opinions.

C.  Plaintiff's Credibility

Plaintiff argues that the ALJ did not provide specific, clear, and convincing reasons to

reject Plaintiff's testimony. The ALJ found that Plaintiff's medically determinable impairments

could reasonably be expected to cause some of the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC analysis. The ALJ discounted Plaintiff's credibility determination based on inconsistent statements, inconsistency with the medical evidence, and her less than candid responses at the hearing.

*Applicable Law*

The Ninth Circuit established two requirements for a claimant to present credible symptom testimony: the claimant must produce objective medical evidence of an impairment or impairments, and she must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986). The claimant, however, need not produce objective medical evidence of the actual symptoms or their severity. *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996). Where an ALJ concludes that a claimant is not malingering, and that she has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms alleged, the ALJ may "reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).

The Commissioner may not discredit a claimant's testimony on the severity of symptoms merely because it is unsupported by objective medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991). However, an ALJ is entitled to consider whether there is a lack of medical evidence to corroborate a claimant's subjective symptom testimony so long as it is not the only reason for discounting her testimony. *Burch v. Barnhart*, 400 F.3d 676, 680-681 (9th Cir. 2005).

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set

1    forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*,

2    495 F.3d at 635. *See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006).

3    Although the credibility analysis need not be extensive, the ALJ must provide some reasoning in

4    order to meaningfully determine whether the ALJ's conclusions were supported by substantial

5    evidence. *Brown-Hunter v. Colvin*, 806 F.3d 487, 495 (9th Cir. 2015).

6         When weighing a claimant's credibility, the ALJ may consider the claimant's reputation

7    for truthfulness, inconsistencies in claimant's testimony or between his testimony and conduct,

8    claimant's daily activities, claimant's work record, and testimony from physicians and third

9    parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social*

10   *Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary

11   techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent

12   statements concerning the symptoms, and other testimony by the claimant that appears less than

13   candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a

14   prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533

15   F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the

16   ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her

17   decision. *Thomas*, 278 F.3d at 959.

18   *Analysis*

19        Here, the record supports the ALJ's finding that Plaintiff's statements concerning the

20   limiting effects of her symptoms were not entirely credible. Plaintiff's testimony at the hearing

21   was less than candid. She testified that she did not know where her husband lived, but then later

22   testified that he lived nearby and that he visited about once a month. She also testified that she did

23   not know if he was employed.

24        Some of Plaintiff's testimony is in conflict with the medical record. She testified that she

25   never used illegal drugs, but she had amphetamines in her system in 2009. She testified that she

26   had trouble sleeping, but also testified taking four to five naps a day. Treatment notes also

27   indicate normal sleep. She testified that she suffered many side effects from her several pain

28   medications, but those side effects are not mentioned in the treatment notes. Dr. Wagner's

1  examination revealed little evidence of physical impairment and substantial mental soundness.

2  This is inconsistent with Plaintiff's complaints of severely disabling pain, confusion, anxiety, and

3  depression.  Plaintiff's ability to interact with treating and examining physicians and her family

4  also contradicts her claims that she cannot properly socialize.

5      The ALJ also pointed to the prior ALJ's decision, in which the prior ALJ found that

6  Plaintiff was less than fully credible as a witness with exaggerated pain behavior and

7  uncorroborated allegations of multiple falls.

8      In sum, the ALJ found that Plaintiff's subjective symptom testimony was not credible

9  because of inconsistent statements, inconsistency with the medical evidence, and her less than

10 candid responses at the hearing. Taken together, these reasons are sufficiently specific, clear, and

11 convincing grounds which are supported by substantial evidence in the record to discount

12 Plaintiff's credibility.

13      D.  Laywitness Testimony

14      Plaintiff argues that the ALJ erred in giving little weight to Plaintiff's son's statement

15 regarding Plaintiff's limitations.

16      Lay witness testimony is competent evidence to which the ALJ, if he wishes to discount

17 lay witness testimony, must give reasons germane to each witness. *Stout v. Comm'r, Soc. Sec.*

18 *Admin.*, 454 F.3d 1050 (9th Cir. 2006). The Ninth Circuit has held that inconsistency with medical

19 evidence constitutes a legitimate reason for discrediting the testimony of lay witnesses. *See*

20 *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984); *see also Bayliss v. Barnhart*, 427 F.3d

21 1211, 1218 (9th Cir. 2005); *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). To the extent that

22 the lay witness statements were of the same general nature as the subjective complaints from the

23 plaintiff's testimony, the ALJ's legally sufficient reasons for rejecting the plaintiff's subjective

24 symptom testimony also constituted legally sufficient reasons for rejecting the lay witness

25 statements. *See Valentine v. Commissioner, Social Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

26 Further, an ALJ's failure to comment on lay witness testimony is harmless where the same

27 evidence that the ALJ cited in discrediting the claimant's testimony also discredits the lay witness'

28 claims. *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012).

Plaintiff's son provided a written statement describing Plaintiff's daily activities and limitations. It is remarkably similar to Plaintiff's written statement. The ALJ discussed Plaintiff's son's statement and accorded it little weight because of inconsistency with other reports, internal inconsistency, and a tendency to exaggerate Plaintiff's limitations which are not supported by medical findings. As discussed, the ALJ properly found that Plaintiff's alleged limitations were not supported by the record. The ALJ gave reasons germane to Plaintiff's son in discrediting his testimony. Hence, his consideration of Plaintiff's son's testimony is without legal error and supported by substantial evidence in the record.

## IV.   Conclusion and Order

For the foregoing reasons, the Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court hereby DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **March 9, 2016**                          **/s/ Sandra M. Snyder**
                                                 UNITED STATES MAGISTRATE JUDGE